AF Approval _____          Chief Approval _____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:14-cr-50-Orl-40TBS

JACK LEITNER GONZALEZ LONDONO

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by A. Lee Bentley, III, United States Attorney for the Middle District of Florida, and the defendant, JACK LEITNER GONZALEZ LONDONO, and the attorney for the defendant, Tim Bower Rodriguez, Esquire, mutually agree as follows:

**A.     Particularized Terms**

1.     Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Indictment.  Count One charges the defendant with conspiracy to import heroin and cocaine into the United States, in violation of 21 U.S.C. §§ 963 and 960(b)(1)(A).

2.     Minimum and Maximum Penalties

Count One is punishable by a mandatory minimum term of imprisonment of 10 years up to life, a fine of not more than $10,000,000, a term of supervised release of at least 5 years, and a special assessment of $100.

Defendant's Initials _____

3.    Apprendi v. New Jersey

Under Apprendi v. New Jersey, 530 U.S. 466 (2000), a maximum

sentence of life may be imposed because the following facts have been admitted

by the defendant and are established by this plea of guilty:  the amount of heroin

attributable to the defendant is one kilogram or more and the amount of cocaine

attributable to the defendant is five or more kilograms.

4.    Elements of the Offense

The defendant acknowledges understanding the nature and

elements of the offense with which defendant has been charged and to which

defendant is pleading guilty.  The elements of Count One are:

> First:      Two or more people in some way agreed to try to
> accomplish a shared and unlawful plan to import
> heroin;
>
> Second:   the defendant knew the unlawful purpose of the plan
> and willfully joined in it; and
>
> Third:     the object of the unlawful plan was to import more
> than one kilogram of heroin, and more than five
> kilograms of cocaine.

5.    Counts Dismissed

At the time of sentencing, the remaining counts against the

defendant, Counts Two, Seven, and Eight, will be dismissed pursuant to Fed. R.

Crim. P. 11(c)(1)(A).

6.    No Further Charges

If the Court accepts this plea agreement, the United States

Attorney's Office for the Middle District of Florida agrees not to charge defendant

Defendant's Initials  L J                  2

with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

7.    Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement.  The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8.    Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Defendant's Initials  L.J.                3

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    <u>Safety Valve Provision</u>

The United States will recommend to the Court that it impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, pursuant to USSG §5C1.2, if the Court finds that the defendant meets the criteria set forth in 18 U.S.C. § 3553(f).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

10.    <u>Cooperation - Substantial Assistance to be Considered</u>

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a

Defendant's Initials L_T_          4

prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot

and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

11.    Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

12.    Cooperation - Responsibilities of Parties

a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)      The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)      The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

13.   Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853, whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action.  The defendant also hereby agrees to waive all constitutional, statutory and procedural challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government.  Pursuant to the provisions of Rule 32.2(b)(1)(A), the United States and the defendant request that promptly after accepting this Plea Agreement, the Court make a determination that the government has established the requisite nexus between the property subject to forfeiture and the offense to which defendant is pleading guilty and enter a preliminary order of forfeiture.  Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing.  The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG §1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of his cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that the United States is not limited to forfeiture of the property specifically identified for forfeiture in this Plea Agreement.  If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without

difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above.  The Court shall retain jurisdiction to settle any disputes arising from application of this clause.  The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

14.   <u>Removal - Consent and Cooperation</u>

The defendant agrees and consents to removal from the United States following completion of the defendant's sentence and agrees to waive the defendant's rights to any and all forms of relief from removal or exclusion.  The defendant further agrees to abandon any pending applications for relief from removal or exclusion, and to cooperate with the Department of Homeland Security during removal proceedings.

**B.**     **Standard Terms and Conditions**

    1.     Restitution, Special Assessment and Fine

        The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.  On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  The special assessment is due on the date of sentencing.  The defendant understands that this agreement imposes no limitation as to fine.

Defendant's Initials L T                     12

2.     Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.     Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.     Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition.  The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party.  The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years.  The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United

States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.   <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.   <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.   <u>Voluntariness</u>

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and

defendant's attorney and without promise of benefit of any kind (other than the

concessions contained herein), and without threats, force, intimidation, or

coercion of any kind.  The defendant further acknowledges defendant's

understanding of the nature of the offense or offenses to which defendant is

pleading guilty and the elements thereof, including the penalties provided by law,

and defendant's complete satisfaction with the representation and advice

received from defendant's undersigned counsel (if any).  The defendant also

understands that defendant has the right to plead not guilty or to persist in that

plea if it has already been made, and that defendant has the right to be tried by a

jury with the assistance of counsel, the right to confront and cross-examine the

witnesses against defendant, the right against compulsory self-incrimination, and

the right to compulsory process for the attendance of witnesses to testify in

defendant's defense; but, by pleading guilty, defendant waives or gives up those

rights and there will be no trial.  The defendant further understands that if

defendant pleads guilty, the Court may ask defendant questions about the

offense or offenses to which defendant pleaded, and if defendant answers those

questions under oath, on the record, and in the presence of counsel (if any),

defendant's answers may later be used against defendant in a prosecution for

perjury or false statement.  The defendant also understands that defendant will

be adjudicated guilty of the offenses to which defendant has pleaded and, if any

of such offenses are felonies, may thereby be deprived of certain rights, such as

the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

FACTS

Beginning in or about November 2012, the Colombian National Police (CNP), in cooperation with the U.S. Drug Enforcement Administration (DEA) Bogota Country Office, initiated an investigation of a drug trafficking organization (DTO) based in Colombia that was led by Steven Ramirez Torres (Ramirez).  Ramirez is a U.S. citizen who lived in Orlando, Florida, and in Colombia.  The investigation included physical surveillance, cooperating defendants, intercepted drug shipments, and Colombian court authorized electronic communications intercepts (wiretaps) on telephones used by members of the DTO.  The investigation by the CNP and DEA developed evidence that this DTO had been sending heroin and cocaine from Bogotá, Colombia, to the Middle District of Florida by different methods: fishing vessel, commercial shippers, and human couriers.  The defendant, JACK LEITNER GONZALEZ LONDONO (GONZALEZ) and Nestor Alexander Paz Sarria (Paz Sarria) obtained the heroin in Colombia.  Jose Hurtado Delgado (Hurtado) organized the shipments of the

heroin and fabricated the heroin into various forms.  Omar Torres Ferrerosa

(Torres) and Claudia Franco (Franco) assisted with transportation of the heroin.

Liviany Caez Santana (Caez) facilitated the storage and distribution of heroin in

the United States.  GONZALEZ, Paz Sarria, Hurtado, Torres, and Franco are

citizens of Colombia.

Specific facts involving the defendant include the following:

On October 29, 2012, the CNP seized approximately 7 kilograms of

cocaine from a fishing boat in Guajira, Colombia.  The boat was destined for a

stop in Aruba before reaching a final destination in the United States.  One

subject was arrested by the CNP.  The CNP determined that Ramirez,

GONZALEZ, and another associate were responsible for coordinating and

financing the cocaine shipment.

In November of 2012, the CNP intercepted communications

regarding the shipment of cocaine from Cali, Colombia, to Tampa, Florida.

Through these wiretaps and surveillance the CNP identified co-defendant

Ramirez as the person providing the money to purchase the cocaine.  The CNP

also intercepted conversations about Hurtado molding the cocaine to resemble

small individually wrapped candies, which were inside sealed packages labeled

as a brand of Colombian candy.  The CNP wiretaps also recorded a conversation

showing the shipment was coordinated by GONZALEZ and the package was

shipped with a delivery address in Tampa, Florida.  The CNP wiretaps disclosed

a FedEx tracking number for a package that had been sent to Tampa, Florida,

and on November 21, 2012, the DEA Tampa District Office intercepted a FedEx package with that number and seized approximately 1 kilogram of cocaine, packaged to resemble candy.

On January 28, 2013, the CNP seized a package containing approximately 487 grams of heroin at the Alfonso Bonilla Aragon International Airport near Cali, Colombia.  The package was addressed to a location in Miami, Florida, and contained a decorative metal vase.  The heroin was concealed inside the vase and was seized by the CNP.  Through wiretaps and surveillance the CNP determined Ramirez, GONZALEZ, and Hurtado, were responsible for the shipment.

On June 24, 2013, the CNP seized a package containing approximately 1 kilogram of cocaine at the El Dorado International Airport in Bogotá, Colombia.  The package was addressed to a location in Caguas, Puerto Rico, and contained a large industrial metal spool for holding wire or cable.  The cocaine was concealed inside the center axis of the spool and was seized by the CNP.  Through wiretaps and surveillance the CNP determined that Ramirez, GONZALEZ, and Hurtado were responsible for the shipment.

On August 18, 2013, the CNP stopped a subject with heroin concealed in his shoes.  The subject was scheduled to travel from Tulua, Colombia, to Venezuela, and then to the United States.  Approximately 510 grams of heroin pellets were hidden in the soles of the subject's shoes.  The heroin was seized and the subject was arrested by the CNP.  Through wiretaps

Defendant's Initials L.J.                    20

and surveillance the CNP determined Ramirez, GONZALEZ, and three other associates were responsible for the attempted transportation of heroin by this human courier.

On August 21, 2013, the CNP detained another subject with heroin concealed in his shoes.  Approximately 510 grams of heroin were hidden in the soles, similar to the previous seizure.  The subject was arrested while attempting to travel from Colombia to Venezuela, and then to the United States.  CNP wiretaps and surveillance determined Ramirez, GONZALEZ, and three other associates were responsible for the attempted transportation of this heroin.

On September 25, 2013, the CNP detained a female subject in Tulua, Colombia.  The female was wearing a garment with 930 grams of cocaine sewn into panels of the material.  The female was traveling to Bogotá to deliver the cocaine to Ramirez, who was to send the cocaine to the United States via human courier.  CNP wiretaps and surveillance identified Ramirez and GONZALEZ as being responsible for the attempted cocaine transportation.

In September 2013, the CNP provided wiretap information to the DEA Orlando District Office which led to the identification of JetBlue flight attendant Carla Alvarado, who would be transporting heroin from Bogotá to Orlando, while working as an aircrew member of a JetBlue flight.

Alvarado had been friends with Jorge Alomar Baello (Alomar) for several years.  Around May 2013, Alomar introduced Alvarado to Ramirez. Alomar and Ramirez asked Alvarado if she would use her position as a flight

attendant to transport drugs from Bogotá to Orlando.  Alomar told Alvarado she would be paid $10,000 upon her successful delivery of the drugs.  Alvarado then asked the JetBlue crew schedulers to assign her to two round-trip flights from the U.S. to Bogotá.

On September 12, 2013, Alvarado worked as a flight attendant on a flight from Orlando to Bogotá.  Later that evening, Alvarado met with Ramirez and co-conspirator Omar Alonso Torres Ferrerosa (Torres) at the Marriot hotel in Bogotá.  Ramirez and Torres brought a women's girdle which contained approximately 1,005 grams of heroin sewed into flat panels in the garment.  Ramirez and Torres also brought a vaginal insert containing heroin, and K-Y Jelly to lubricate the insert.  The insert was too large for Alvarado to conceal so she left it with Ramirez and Torres.

On September 13, 2013, Alvarado worked her scheduled flight attendant shift and traveled back to Orlando from Bogotá.  Alvarado cleared Customs with the heroin undetected.  She later met with Alomar and followed him to the Orlando residence Ramirez shared with his girlfriend, co-defendant Caez.  Alvarado gave the heroin to Caez and informed Ramirez via BlackBerry Message (BBM) that it had been delivered.

Alomar returned to the Ramirez residence at a later date and retrieved approximately half of the heroin and sold it to street customers.  Alomar then paid Alvarado $10,000 from the proceeds of the heroin sales.  Caez later gave Alomar approximately $3,000 from the sale of a portion of the heroin.

Alomar communicated with Ramirez via GONZALEZ's BBM to coordinate the transfer of the heroin cash proceeds back to Bogotá.  Alomar sent approximately $7,000 to Ramirez and his associates in $500 increments via Western Union.

On September 26, 2013, Alvarado again worked a JetBlue flight from Orlando to Bogotá.  Later that evening, Ramirez spoke with Alvarado on the phone and told her Torres and co-conspirator Franco would meet her in Alvarado's room at the Marriot hotel in Bogotá.  Torres and Franco arrived with a duffle bag containing heroin pellets wrapped in plastic, and several women's girdles.  Alvarado tried on different girdles while Torres and Franco cut the plastic to fit her body contour.  Torres and Franco also asked Alvarado to use a vaginal insert containing heroin but Alvarado declined.  Torres and Franco fitted panels of plastic wrapped heroin on Alvarado's back, abdomen and pelvic areas.  Torres and Franco then left the hotel, leaving the heroin and the garment with Alvarado.

After Torres and Franco left, Alvarado called Ramirez to tell him that the garment was too bulky and uncomfortable.  Torres returned a short time later and removed the back and pelvic panels of the garment.  Torres then left the hotel with those panels.  Alvarado's garment then held only a panel of heroin pellets laying across her abdomen.

On September 27, 2013, Alvarado worked her scheduled flight from Bogotá to Orlando.  CBP conducted a secondary screen of all JetBlue crew members, including Alvarado.  During Alvarado's screening, she readily admitted that she was carrying something illegal.  Agents helped her undress and they

Defendant's Initials L J          23

found she was wearing a body suit under her uniform.  A panel from the abdomen area contained individually wrapped heroin pellets disguised as chocolate candies, with a total weight of 940 grams of heroin.

Alvarado delivered the heroin to Alomar on the following day. Alvarado and Alomar were both arrested.  Alomar received a BBM from Ramirez asking if everything was okay.  Alomar replied to Ramirez via BBM telling that he had the heroin.

The following summaries of conversations are from the CNP wiretaps:

On September 18, 2013, at 8:50 p.m., the CNP intercepted a call between GONZALEZ and Hurtado.  Ramirez was also present with GONZALEZ. During the call, GONZALEZ and Hurtado discussed the size of the garment for Alvarado.  Hurtado said, "Mono, you told me they were XL and what?" GONZALEZ replied, "And L." Hurtado stated, "No, dude, t... that pattern is too small. Because I'm measuring it over here..."  Aside, GONZALEZ asked Ramirez:  "Yeah. Is she, uh, is the flight attendant bigger than ... than her, or just the same?" Ramirez got on the phone with Hurtado and they discussed Alvarado's dimensions and various types of corsets and garments.

On September 27, 2013, at 9:38 a.m., the CNP intercepted a call between Franco and Hurtado.  During the call, Franco and Hurtado discussed the way the heroin was wrapped and Franco fitting Alvarado with the heroin panels concealed in the garments.  Franco said, "That showed up in a thi... a

white thing, uh, with plastic. But the plastic was taken off and they put on that transparent plastic that didn't make any noise, but then it was wrapped in tape and that made a lot of noise." Franco talked about the panels bothering Alvarado: "The one that was bothering her ... the one that was bothering her was the part in back and one that got put in down here underneath." Franco later said, "And we took off the plastic and we wrapped it in the transparent paper, not in cellophane, the other one that ... that transparent one that they wrap candies in. You ... you know? So, we wrapped it there so she wouldn't make a lot of noise. She ... she put it there, and she put the other one that would tighten ... the ... the girdle, you know?" Hurtado said, "But ... but listen, but ... but did she take the one for the waist?" Franco replied, "No, she didn't take it. What she took was shapewear that I had him buy yesterday."

On September 27, 2013, at 10:11 a.m., the CNP intercepted a call between Paz Sarria and Hurtado. During the call, Paz Sarria and Hurtado discussed Alvarado not being able to fit the panels of heroin on her back and pelvis. Hurtado talked to Paz Sarria about how many heroin pellets Alvarado was able to conceal. Hurtado said "Well, it was super big, the girl couldn't make it fit, man." Hurtado said, "Send me ...send me the measurements for that, how much was in each ... each strip .... You remember the measurements, yes or no? In other words, the one ... the one for the belly button. You know what I mean? So, do you know what I mean or not?" Hurtado later asked, "For example, on the belly of the ...of ...of ...of the waist, the one you're taking

about, the waist, how many bananas were there?"  Paz Sarria answered, "I think there were 100. Let me make sure and then I'll ... I'll call you."

On September 27, 2013, at 10:27 a.m., the CNP intercepted a call between Paz Sarria and Hurtado.  During the call, Paz Sarria gave Hurtado the number of heroin pellets transported by Alvarado.  Paz Sarria said " Navel, 110." Hurtado and Paz Sarria discussed the amount of heroin pellets given to Alvarado and the number left behind with Torres and Franco.  Hurtado said, "Let's hope that they arrive over there to see what ...."

On September 29, 2013, at 7:10 p.m., the CNP intercepted a call between Ramirez and Caez.  During the call, Ramirez and Caez talked in depth about the arrest of Alvarado and Alomar.  Caez said, "He took them to the house. He took them to the house [U/I] He took them to the house and he went and took out the hidden compartment, [U/I]."  Ramirez replied, "How stupid!"  Caez told Ramirez that she spoke to Alomar's wife, and told her, "When you go over there, you don't know anything. Always, 'I don't know' with whatever they might tell you ... Oh, and if even say they're going to take away your kids and even if they tell you, you say, 'I don't know what they're doing over there. I don't know. I don't know anything.' And you play the dumbass, that you didn't know anything because ... and don't say anything over the phone because they can build a case off of that."

Caez and Ramirez also spoke about the text message Ramirez received from Alomar confirming Alomar received the heroin from Alvarado.

Defendant's Initials L.J.          26

Caez said, "But it's just that, no ... Hon, and what I don't understand is that early on you told me, 'He's in. Everything made it just fine. Everything's here now.' What the hell was he doing at 1:00 in the afternoon at the airport?"  Ramirez replied, "Well, I don't know. I don't know because that was what he told me ... He told me, "No, it's all good now. It's all settled and this and that." You follow me? I mean, I don't ... I don't ... I don't understand."  Ramirez told Caez how he believes Alomar may have been cooperating with law enforcement.  "Of course, of course, of course. No, no, he fell for it, he fell for it like a fool. And she had to have had a wire when ... when she went to go talk to him. You follow?"  Ramirez told Caez that he was going to get a different telephone number and they spoke about whether law enforcement can arrest him in Colombia. Ramirez stated, "I'll get another card ... a num ... two numbers, and I'll give them to you. You can call me here and [U/I] to talk to me. And so, well, they won't be telling me anything. I don't know how... how far they can go in ... in getting to me here, you know what I mean? I don't think ... I don't think it's a lot, but since ... with sworn statements and then the two of them volunteering, well, that's another 20 pesos. With just one, I don't know, but ..."

On September 29, 2013, the CNP intercepted a call between Ramirez and Caez.  During the call, Ramirez instructed Caez to remove heroin or other incriminating evidence from the house.  Ramirez said, "The important thing is any, uh, search you have, that ... that ... that there is around there, you know, then get it out. And then, with that crap that never ... that never worked, the one

Defendant's Initials _____          27

in the seat that's in the room, the brown one. On the sides ... Put your hands in the sides, because there I ... I put away like some ... a [U/I] of samples and things. Stick them there. And look around there, around the jars, and ..."  Caez interrupted, " [U/I] where I put the junk?"  Ramirez said, " Yeah, where you put the junk. There in that brown chair that's next to the shotgun. And then, on the ... on the little night table there in the corner, inside the lamp and stuff, there were three. It's little things of two lines, things like that that were ... Like when I practiced. That's all that's left around there."  Caez asked Ramirez if she should throw it away and Ramirez told her to put the items into a sealed bag and put the bag behind a partition behind the house.  Ramirez told Caez that he may be able to activate it when he returns.

On November 18, 2013, the CNP intercepted communications relating to a shipment of heroin from Cali, Colombia, to Orlando, Florida.  The CNP intercepted a package at the Alfonso Bonilla Aragon International Airport near Cali, Colombia.  The package was addressed to a residence in Orlando, Florida, and contained an air purification machine.  Further inspection revealed approximately 4.66 kilograms of heroin made to resemble rubber insulation inside the device.  The CNP advised that Hurtado fabricated the heroin into the rubber type form and GONZALEZ and Ramirez coordinated the shipment.

During February 2014, the CNP intercepted communications regarding the shipment of approximately 1 kilogram of heroin to Orlando, Florida, from Cali, Colombia.  On February 6, 2014, a package was shipped via DHL

Express to an address in Orlando, Florida.  Orlando DEA agents coordinated with HSI Orlando and the package was inspected by CBP upon entering the United States in Cincinnati, Ohio.  The package contained travel neck pillows that appeared to be stuffed with normal Styrofoam beads.  Upon closer inspection, CBP determined the beads were mixed with small pieces of a rubber-like material.  CBP conducted presumptive tests on the substance which were positive for heroin.  The approximate weight of the rubber and Styrofoam mixture was approximately 1.5 kilograms.  CNP advised that its wiretaps and surveillance reveal that Hurtado was responsible for fabricating the heroin and Ramirez and GONZALEZ coordinated the payment and shipment of the heroin to the United States.

12.   Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___19___ day of August, 2015.

A. LEE BENTLEY, III
United States Attorney

_____
JACK LEITNER GONZALEZ LONDONO
Defendant

_____
Bruce S. Ambrose
Assistant United States Attorney

_____
Tim Bower Rodriguez, Esquire
Attorney for Defendant

_____
Carlos A. Perez-Irizarry
Assistant United States Attorney
Chief, Orlando Division